# 133 Nev., Advance Opinion 48

## IN THE SUPREME COURT OF THE STATE OF NEVADA

KUSUM DESAI, AS PERSONAL REPRESENTATIVE FOR DIPAK KANTILAL DESAI,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 64591

FILED

JUL 27 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK



Appeal from a judgment and amended judgment of conviction, pursuant to a jury verdict, of nine counts of insurance fraud, seven counts of performance of an act in reckless disregard of persons or property resulting in substantial bodily harm, seven counts of criminal neglect of patients resulting in substantial bodily harm, theft, two counts of obtaining money under false pretenses, and second-degree murder. Eighth Judicial District Court, Clark County; Valerie Adair, Judge.

*Affirmed in part and reversed in part.*

Franny A. Forsman, Las Vegas; Wright, Stanish & Winckler and Richard A. Wright, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Michael V. Staudaher and Ryan J. MacDonald, Deputy District Attorneys, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.[1]

## OPINION

By the Court, HARDESTY, J.:

A jury convicted appellant Dipak Kantilal Desai of, among other things, seven counts of performance of an act in reckless disregard of persons or property resulting in substantial bodily harm pursuant to NRS 202.595(2), and seven counts of criminal neglect of patients resulting in substantial bodily harm pursuant to NRS 200.495(1), collectively characterized in this opinion as the endangerment crimes. In this appeal, we are asked to determine whether a defendant can aid and abet a negligent or reckless crime, such as the endangerment crimes at issue here. We conclude that a defendant can be convicted of aiding and abetting a negligent or reckless crime upon sufficient proof that the aider and abettor possessed the necessary intent to aid in the act that caused the harm. Because the State presented sufficient evidence to show that Desai acted with awareness of the reckless or negligent conduct and with the intent to promote or further that conduct in the endangerment crimes for which he was convicted, we affirm his convictions for those crimes.

Desai also challenges the sufficiency of the evidence to convict him of second-degree murder. Because there were intervening causes between Desai's actions and the victim's death, we conclude that the State

[1]The Honorable Ron D. Parraguirre, Justice, voluntarily recused himself from participation in the decision of this matter. The Honorable Lidia S. Stiglich, Justice, did not participate in the decision of this matter.

 

presented insufficient evidence to convict Desai of second-degree murder. Accordingly, we reverse Desai's second-degree murder conviction.[2]

## FACTS AND PROCEDURAL HISTORY

Desai was the original founding member and managing partner of the Endoscopy Center of Southern Nevada and other ambulatory surgical centers (collectively, the clinic) in Las Vegas. Desai made all decisions regarding the clinic, including the ordering and use of supplies and scheduling of patients. He was also in charge of the certified registered nurse anesthetists.

On July 25, 2007, the clinic's first patient of the day informed Desai that he had hepatitis C before his procedure began. Later that day, Michael Washington had a procedure performed at the clinic. Washington was later diagnosed with hepatitis C. On September 21, 2007, the clinic's first patient of the day informed a nurse that he had hepatitis C before his procedure began. Later that day, Sonia Orellana Rivera, Gwendolyn Martin, Patty Aspinwall, Stacy Hutchinson, and Rodolfo Meana had procedures performed at the clinic. All five patients were later diagnosed

---

[2]Desai also challenges his convictions on several other grounds: (1) his right to confrontation was violated because he was precluded from adequately cross-examining victim Rodolfo Meana prior to his death, a surrogate testified regarding Meana's autopsy report, and Meana's death certificate was improperly admitted; (2) the State committed prosecutorial misconduct; (3) the district court was required to order another competency evaluation and hold another hearing after Desai suffered a new series of strokes; and (4) his convictions for reckless disregard of persons and criminal neglect of patients must be reversed because they are lesser-included offenses of second-degree felony murder. After careful consideration, we determine that these arguments are without merit and do not warrant discussion.

with hepatitis C. Meana received some treatment following his diagnosis, but failed to adequately complete any treatment and eventually died as a result of the disease.

After learning that multiple patients contracted hepatitis C at the clinic, the Southern Nevada Health District initiated an investigation. Blood samples of the infected patients were sent to the Centers for Disease Control and Prevention (CDC). The CDC determined that the sources for the strains of hepatitis C contracted by Washington, Orellana Rivera, Martin, Aspinwall, Hutchinson, and Meana were the patient seen first at the clinic on July 25, 2007, and the patient seen first at the clinic on September 21, 2007. The CDC also concluded that the outbreak was the result of the clinic's nurse anesthetists reentering vials of propofol after injecting a patient and then reusing those vials of propofol on a subsequent patient.

Desai, along with Ronald Lakeman and Keith Mathahs, who were both nurse anesthetists at the clinic, were indicted. Desai and Lakeman were charged with ten counts of insurance fraud, seven counts of performance of an act in reckless disregard of persons or property resulting in substantial bodily harm, seven counts of criminal neglect of patients resulting in substantial bodily harm, theft, two counts of obtaining money under false pretenses, and second-degree murder. Mathahs agreed to testify against Desai and Lakeman after pleading guilty to criminal neglect of patients resulting in death, criminal neglect of patients resulting in substantial bodily harm, obtaining money under false pretenses, insurance fraud, and conspiracy. A jury found Desai guilty of

all counts except one omitted count of insurance fraud. Desai now appeals.[3]

## DISCUSSION

*There was sufficient evidence to convict Desai of the endangerment crimes*

On appeal, Desai argues that there is insufficient evidence to convict him of the endangerment crimes because he did not have the required intent for aiding and abetting. To resolve this issue, we must first determine whether one can aid and abet a negligent or reckless crime.

### *Aiding and abetting a negligent or reckless crime*

Desai argues that there was insufficient evidence to convict him of the endangerment crimes because he did not possess the intent required to prove that he aided and abetted Lakeman and Mathahs. We disagree.[4] When reviewing a challenge to the sufficiency of the evidence,

---

[3]We note that appellant Dipak Kantilal Desai passed away on April 10, 2017. On June 6, 2017, Kusum Desai filed a motion to substitute as the personal representative for appellant Desai, deceased, pursuant to NRAP 43(a)(1), arguing that this court should resolve the appeal because it raises important issues of first impression, some of which are constitutional in nature. The State did not oppose the motion, and on June 14, 2017, this court granted the motion to substitute. *See Brass v. State*, 129 Nev. 527, 530, 306 P.3d 393, 395 (2013) ("[W]hen a criminal defendant dies after a notice of appeal has been filed, a personal representative must be substituted for the decedent within 90 days of his death being suggested upon the record . . . .").

[4]The indictment charged Desai with committing the endangerment crimes under three theories of liability: Desai directly committed the act, aided and abetted the principal in committing the act, or conspired with the principal in committing the act. Indictments are allowed to present "alternat[ive] theories of liability as long as there is evidence in support of those theories." *Walker v. State*, 116 Nev. 670, 673, 6 P.3d 477, 479 (2000);

*continued on next page . . .*

SUPREME COURT
OF
NEVADA

(O) 1947A

5

we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The criminal offenses at issue here are set forth in NRS 202.595 and NRS 200.495. NRS 202.595 prohibits a person from "perform[ing] any act or neglect[ing] any duty imposed by law in willful or wanton disregard of the safety of persons or property." NRS 200.495(1) punishes "[a] professional caretaker who fails to provide such service, care or supervision as is reasonable and necessary to maintain the health or safety of a patient." And NRS 195.020 provides that a person who aids and abets in the commission of a crime shall be punished as a principal. However, we have not previously determined whether one can aid and abet a reckless or negligent crime.

Some jurisdictions have determined that a defendant cannot be convicted of aiding and abetting a reckless or negligent crime because "it is logically impossible to intend to aid" another in acting recklessly or

---

. . . *continued*

*see also* NRS 173.075(2). Because we conclude that there was sufficient evidence to convict Desai under an aiding and abetting theory of liability, we do not discuss the other two theories of liability. *See State v. Kirkpatrick*, 94 Nev. 628, 630, 584 P.2d 670, 671-72 (1978) ("Where . . . a single offense may be committed by one or more specified means, and those means are charged alternatively, the state need only prove one of the alternative means in order to sustain a conviction.").

SUPREME COURT
OF
NEVADA

(O) 1947A

negligently.[5]   Audrey Rogers, *Accomplice Liability for Unintentional Crimes: Remaining Within the Constraints of Intent*, 31 Loy. L.A. L. Rev. 1351, 1383 (1998). These jurisdictions opine that "[a]pplying accomplice liability [to reckless or negligent crimes] raises troubling questions about whether the complicity doctrine is being stretched beyond its proper limits merely to find a means of punishing the [secondary actor]." *Id.* at 1353.

It appears, however, that courts are moving away from this rule, *see id.* at 1352 (explaining that "a growing number of courts have found secondary actors responsible for another individual's unintentional crime"), because "giving assistance or encouragement to one it is known will thereby engage in conduct dangerous to life should suffice for accomplice liability." Wayne R. LaFave, *Criminal Law* § 13.2(e) (5th ed. 2010). We are persuaded by the rationale for this approach and thus decline to completely excuse an aider and abettor of a reckless or negligent crime from liability. Although NRS 195.020 provides that an aider and abettor shall be punished as a principal, the statute "does not specify what

---

[5]*See, e.g., Fight v. State*, 863 S.W.2d 800, 805 (Ark. 1993) (agreeing with the New Hampshire Supreme Court "that an accomplice's liability ought not to extend beyond the criminal purposes that he or she shares" (quoting *State v. Etzweiler*, 480 A.2d 870, 874 (N.H. 1984), *superseded by statute on other grounds as stated in State v. Anthony*, 861 A.2d 773, 775-76 (N.H. 2004))); *People v. Marshall*, 106 N.W.2d 842, 844 (Mich. 1961) (determining that an owner of a vehicle who gave his keys to an intoxicated individual who killed another could not be found guilty of manslaughter because "the killing of [the victim] was not counselled by him, accomplished by another acting jointly with him, nor did it occur in the attempted achievement of some common enterprise"); *Etzweiler*, 480 A.2d at 874-75 (holding that the aider and abettor "could [not] intentionally aid [the principal] in a crime that [the principal] was unaware that he was committing").

mental state is required to be convicted as an aider or abettor." *Sharma v. State*, 118 Nev. 648, 653, 56 P.3d 868, 870 (2002). Thus, we must determine what mental state is required to convict an aider and abettor of a reckless or negligent crime.

In *Sharma*, the appellant challenged his conviction for aiding and abetting attempted murder, arguing that the jury was improperly instructed on the necessary elements of the crime. *Id.* at 650, 56 P.3d at 869. This court held "that in order for a person to be held accountable for the *specific intent crime* of another under an aiding or abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime." *Id.* at 655, 56 P.3d at 872 (emphasis added). The mental state articulated in *Sharma* for specific intent crimes leaves open the question as to the mental state required for reckless or negligent crimes. Consistent, however, with our reasoning in *Sharma*, we conclude that an aider and abettor must act with awareness of the reckless or negligent conduct and with the intent to promote or further that conduct.

This holding is consistent with how other jurisdictions have held. *See, e.g., People v. Wheeler*, 772 P.2d 101, 105 (Colo. 1989) ("[T]he complicitor must be *aware* that the principal is engaging in [negligent] conduct." (emphasis added)); *State v. Foster*, 522 A.2d 277, 284 (Conn. 1987) ("[A] person may be held liable as an accessory to a criminally negligent act if he . . . intentionally aids another in the crime."); *Commonwealth v. Bridges*, 381 A.2d 125, 128 (Pa. 1977) ("[A]n accomplice's conduct must, with the intent to promote or facilitate, aid one whose conduct does causally result in the criminal offense."); *State v. McVay*, 132 A. 436, 439 (R.I. 1926) (determining that the defendant could

SUPREME COURT
OF
NEVADA

(O) 1947A

8

be charged as an aider and abettor because he "recklessly and willfully advised, counseled, and commanded [the principals] to take a chance by negligent action or failure to act").

Having concluded that Desai can be charged as an aider and abettor in a negligent or reckless crime, we must now determine whether there was sufficient evidence presented to show that Desai possessed the necessary intent to aid and abet in the endangerment crimes for which he was convicted.

*There was sufficient evidence to show that Desai intended to aid and abet in the endangerment crimes*

Desai argues that the State did not sufficiently prove that he had knowledge that Mathahs' and Lakeman's injection practices violated a standard of patient care or that he intended for them to violate a standard of patient care. Desai also argues that the State failed to prove that he had knowledge of the lack of availability and reuse of supplies at the clinic.

According to a CDC medical officer, unsafe injection practices result when a nurse anesthetist administers to a patient one dose of propofol using a needle and syringe and places that same syringe back into a vial of propofol—even if the needle is changed—which is then later used on a second patient. There is a risk that any blood in the syringe from the first patient will be transferred to the propofol vial that is later used on a second patient.

When the State questioned Mathahs about reentering a propofol vial in order to redose a patient, Mathahs testified that he would replace the needle before reentering the vial. Mathahs further testified on direct examination as follows:

[STATE]: Are you aware that there is at least a risk of potential contamination even changing out the needle in that situation?

[MATHAHS]: Yes, there is.

[STATE]: Did you ever express your concerns about doing this to Dr. Desai?

[MATHAHS]: Yes.

[STATE]: What was his response?

[MATHAHS]: It's to save money, just go ahead and do it.

[STATE]: So he instructed you to do it even though you made him aware of the risk?

[MATHAHS]: Yes.

This line of questioning occurred again on redirect examination:

[STATE]: Did you not testify on direct examination that when Desai told you to do this, reuse stuff that you had never done before, that you expressed the risk to him and that he told you to do it anyway?

[MATHAHS]: I don't remember the exact conversation but, yes, I'm sure it was had, yes.

[STATE]: So you expressed—just so we're clear, in whatever words, you expressed that there was a risk in doing that to Dr. Desai and he ordered you to do it anyway and you did it.

[MATHAHS]: Yes.

Further, Gayle Langley, a CDC medical officer, testified that she observed Mathahs reenter a vial of propofol with the same syringe.

Mathahs testified that Desai checked the disposal containers and, if he found any unused propofol remaining in the syringes or vials of propofol, he would yell at the responsible nurse anesthetist for being wasteful. Mathahs "guess[ed]" that Desai wanted any unused propofol to

Supreme Court
OF
Nevada

(O) 1947A

10

be used on a subsequent patient and testified that he would likely be fired if Desai found a discarded vial still containing propofol.

The State also called Nancy Sampson, an analyst with the Las Vegas Metropolitan Police Department (LVMPD), to testify regarding charts she prepared that summarized patient records from the clinic. Sampson testified that the clinic's 2007 records indicated that it did not have adequate supplies to use a new vial of propofol on each patient and a new syringe for each injection.

Clinic employees testified that Desai complained that the nurse anesthetists used too many supplies, told employees that supplies should not be wasted, told a nurse anesthetist that he used too much propofol, and promised the nurse anesthetists a bonus if they brought the cost of propofol down. There was further testimony that Desai admonished other doctors if they changed their used gown after a procedure, Desai yelled if a nurse put a sheet on a patient, and materials were cut in half. Jeffrey Krueger, a nurse at the clinic, testified that a technician informed him that Desai had instructed her to reuse disposable forceps. When Krueger explained to Desai that they had "gone over this [issue], that we have plenty of them, there is no need to reprocess, they're single use, we know the risks of it," Desai said, "I know, I know, okay, okay."

Finally, Ralph McDowell, a nurse anesthetist at the clinic, testified that Desai told him to pretend that he did not know what a multiuse vial was if he was asked. And an LVMPD detective testified that

a nurse anesthetist told him that Desai told her to inject patients "the way [Lakeman] did it."[6]

"Intention is manifested by the circumstances connected with the perpetration of the offense," NRS 193.200, and the jury is tasked with determining intent, *see State v. McNeil*, 53 Nev. 428, 435, 4 P.2d 889, 890 (1931) (stating that the "question of intent . . . must be left to the jury"). The State presented evidence that the clinic lacked adequate supplies to safely inject patients with propofol and Desai was more concerned with curbing waste of supplies than with patient comfort or safety. Additionally, Mathahs testified that he was aware of the risks of reusing the same needle and expressed his concerns to Desai, and that Desai encouraged the nurse anesthetists to reuse propofol vials if there was any remaining propofol following a procedure. The evidence further demonstrated that Desai was not concerned when nurse anesthetists failed to follow proper procedures, and Desai requested that nurse anesthetists conceal unsafe injection practices.

Viewing the evidence adduced at trial in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found beyond a reasonable doubt that Desai was guilty of the endangerment crimes. While there was conflicting testimony and other evidence regarding clinic injection practices, the availability of supplies, and Desai's knowledge of supply reuse at the clinic, it was the jury's duty

---

[6]Another CDC medical officer testified that Lakeman told her that reentering a vial of propofol with the same syringe "was not the safest practice, but that he would keep pressure on the plunger to . . . try to prevent backflow of anything into the syringe from the patient."

to weigh the evidence and assess the credibility of the witnesses. *See McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) ("[I]t is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses.").

Thus, we conclude that the State presented sufficient evidence for the jury to find that Desai possessed the necessary intent to aid and abet in the endangerment crimes, and we thus affirm Desai's convictions for these crimes.

*There was insufficient evidence to convict Desai of second-degree murder*

Desai challenges the sufficiency of the evidence to convict him of second-degree murder. According to the instructions given to the jury, there were two theories of liability under which the jury could convict Desai of second-degree murder: second-degree felony murder or murder in the second degree. The verdict form listed "Count 28 – MURDER (SECOND DEGREE) (Rodolfo Meana)" and had two boxes below the count titled "Guilty of Second Degree Murder" and "Not Guilty." There is no way to tell whether the jury found Desai guilty of second-degree felony murder or murder in the second-degree. Thus, we discuss both theories of liability.

*Second-degree felony murder*

Second-degree felony murder requires an inherently dangerous felony and "an immediate and direct causal relationship between the" defendant's actions and victim's death. *Sheriff v. Morris*, 99 Nev. 109, 118, 659 P.2d 852, 859 (1983). "[I]mmediate" is defined as "without the intervention of some other source or agency." *Ramirez v. State*, 126 Nev. 203, 206, 235 P.3d 619, 622 (2010) (internal quotation marks omitted).



Meana contracted hepatitis C on September 21, 2007, from the unsafe injection practice of a nurse anesthetist at the clinic. Meana died from the hepatitis C infection over four years later on April 27, 2012. During those four years, Meana was told to seek medical treatment by at least two doctors. Although both doctors told Meana that treatment could cure his hepatitis C infection, Meana voluntarily declined full treatment.

We conclude that the link between Desai's reckless and negligent conduct of encouraging unsafe injection techniques is sufficiently attenuated from Meana's death. Meana did not die as an immediate and direct consequence of Desai's actions. Rather, his failure to pursue treatment broke any such direct causal connection. Moreover, the improper act did not have an immediate relationship to Meana's death because over four years passed between the two occurrences, and Meana refused any medical treatment that may have cured the disease that caused his death. *See Morris*, 99 Nev. at 118, 659 P.2d at 859 (expressing specific limitations to the rule's application to attenuate the "potential for untoward prosecutions"). We conclude that any rational trier of fact could not have found beyond a reasonable doubt the essential elements of second-degree felony murder. *See McNair*, 108 Nev. at 56, 825 P.2d at 573.

*Murder in the second degree*

First-degree murder is a "willful, deliberate and premeditated killing." NRS 200.030(1)(a). Second-degree murder "is all other kinds of murder," NRS 200.030(2), and requires a finding of implied malice without premeditation and deliberation, *see Labastida v. State*, 115 Nev. 298, 307, 986 P.2d 443, 449 (1999). Implied malice is demonstrated when the defendant "commit[s] an[ ] affirmative act that harm[s] [the victim]." *Id.*; *see also* NRS 193.190 (requiring unity of act and intent to constitute the

crime charged); NRS 200.020(2) ("Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.").

While Desai aided and abetted the nurse anesthetists to act recklessly and negligently when injecting patients, the nurse anesthetist who improperly injected Meana "commit[ted] [the] affirmative act that harmed" Meana. *Labastida*, 115 Nev. at 307, 986 P.2d at 449. Because Desai's conduct was a step removed from the act that caused the harm, we conclude that any rational trier of fact could not have found beyond a reasonable doubt the essential elements of murder in the second degree. *See McNair*, 108 Nev. at 56, 825 P.2d at 573; *Labastida*, 115 Nev. at 307-08, 986 P.2d at 449.

Although it is unclear under which theory of liability Desai was found guilty, we conclude that there was insufficient evidence to convict him under either theory, and we thus reverse Desai's conviction for second-degree murder.[7]

---

[7]Desai also argues that the third element of second-degree felony murder was omitted from the jury instructions, the trial court failed to instruct the jury on the merger doctrine, and this court should abrogate the second-degree felony-murder rule. Because we reverse Desai's second-degree murder conviction due to insufficient evidence, we need not address these other arguments.

Accordingly, for the reasons set forth above, we affirm the district court's judgment of conviction except for Desai's second-degree murder conviction, which we reverse.

_____, J.
Hardesty

We concur:

_____, C.J.
Cherry

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A